IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TERRI A. ADAMS, | )   CASE NO.  1:25-CV-00790-BMB |
| | ) |
| Plaintiff, | ) |
| | )   **JUDGE BRIDGET MEEHAN BRENNAN** |
| vs. | )   UNITED STATES DISTRICT JUDGE |
| | ) |
| COMMISSIONER OF SOCIAL | )   MAGISTRATE JUDGE |
| SECURITY, | )   JONATHAN D. GREENBERG |
| | ) |
| Defendant. | )   **REPORT AND RECOMMENDATION** |
| | ) |
| | ) |

Plaintiff, Terri Adams ("Plaintiff" or "Adams"), challenges the final decision of Defendant, Frank Bisignano,[1] Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.  PROCEDURAL HISTORY

In November 2022, Adams filed an application for SSI, alleging a disability onset date of June 1, 2022[2] and claiming she was disabled due to postural orthostatic tachycardia syndrome ("POTS"), "Parkinsonian syndrome," back issues, and rheumatoid arthritis.  (Transcript ("Tr.") 10, 191.)  The

---

[1] On May 7, 2025, Frank Bisignano became the Commissioner of Social Security.
[2] At the January 18, 2024 hearing, Adams amended her alleged onset date to November 23, 2022, the date of her application.  (Transcript ("Tr.") 10.)

1

application was denied initially and upon reconsideration, and Adams requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 10.)

On January 18, 2024, an ALJ held a hearing, during which Adams, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On April 9, 2024, the ALJ issued a written decision finding Adams was not disabled.  (*Id.* at 10-22.)  The ALJ's decision became final on February 18, 2025, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On April 18, 2025, Adams filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 6, 8.)  Adams asserts the following assignment of error:

> (1) The ALJ violated 20 C.F.R. § 416.920c during the evaluation of Ms. Story's treating mental health opinions.

(Doc. No. 6 at 7.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Adams was born in October 1974 and was 49 years-old at the time of her administrative hearing (Tr. 10, 20), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. § 416.963(c).  She has at least a high school education.  (Tr. 20.)  She has past relevant work as a personnel clerk and a medical secretary.  (*Id.*)

### B.    Relevant Medical Evidence[3]

On January 27, 2023, Adams completed an Adult Function Report.  (*Id.* at 328-36.)  She lived alone with her 13-year-old son.  (*Id.* at 328.)  Her hobbies and interests consisted of listening to audio books.  (*Id.*

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  As Adams challenges only the ALJ's findings regarding her mental limitations, the Court further limits its discussion to Adams' mental impairments.

at 330.)  She visited with family and/or friends one to two times a week, and talked to others in person, on the phone, and by text message.  (*Id.*)  Adams stated she was "[m]uch less social" than she used to be, as she was "[t]oo embarrassed" to see many of her friends.  (*Id.*)  She could drive, but whether she did so depended on how she felt.  (*Id.* at 331.)  She shopped in stores and online, as well as by phone and by mail. (*Id.*)  She shopped either one day a week or twice a month, depending on how she felt and how well she was able to get around.  (*Id.*)  She could pay bills, count change, handle a savings account, and use a checkbook or money order, although she needed to go over them multiple times to check for mistakes and her family helped her.  (*Id.*)  She cared for her 13-year-old son part time and took care of her cat.  (*Id.*at 332.)  She denied needing reminders to care for herself or take her medication.  (*Id.* at 333.)  She could prepare small, easy meals.  (*Id.*)  She struggled to find the right words and suffered from anxiety and depression.  (*Id.* at 334.)  She could pay attention for 15-20 minutes.  (*Id.*)  She got along "[f]ine" with authority figures and denied being fired or laid off because of problems getting along with others.  (*Id.*)  She described her ability to handle changes in routine as "satisfactory," although stress affected her physically. (*Id.* at 335.)

On April 27, 2023, Adams saw Carol Story, LPCC, for a complete intake evaluation.  (*Id.* at 1663, 1670.)  Adams endorsed depressive symptoms consisting of irritability, lack of enjoyment in activities she previously enjoyed, difficulty concentrating, crying spells, feelings of worthlessness, sadness, and guilt, fatigue, increased worry, decreased sociability, and difficulty sleeping.  (*Id.* at 1663.)  Adams also endorsed feelings of detachment or estrangement and isolation, as well as an "exaggerated startle response."  (*Id.* at 1664.)  Adams also experienced anxiety and panic attacks.  (*Id.* at 1664-65.)  Crowds, noise, and stores triggered her panic attacks.  (*Id.* at 1665.)  Adams reported applying for jobs, although she needed to work remotely because of her health.  (*Id.* at 1667.)  She enjoyed working out, spending time with her children, and scrapbooking.  (*Id.* at 1668.)  She did not drive because of her anxiety.  (*Id.*)

On examination, Story found Adams calm, attentive, and communicative, although she appeared anxious.  (*Id.* at 1669.)  Story further found normal speech, intact associations, logical thought, and appropriate thought content.  (*Id.*)  Story noted signs of "moderate depression," including "glum" demeanor and depressed mood, as well as signs of anxiety.  (*Id.*)  Adams demonstrated a full and appropriate range of affect.  (*Id.*)  Story found Adams "cooperative and attentive with no gross behavioral abnormalities."  (*Id.*)  Story further found fair insight and judgment.  (*Id.*)  Adams' diagnoses consisted of generalized anxiety disorder, major depressive disorder, recurrent, moderate, panic disorder without agoraphobia, and chronic PTSD.  (*Id.* at 1669-70.)

On May 1, 2023, Adams saw Story for follow up and reported continued difficulty focusing, excessive worrying, and tension, avoidance, and hypervigilance when anxious.  (*Id.* at 1660.)  Adams told Story she got so depressed that sometimes she did not shower or care for her personal hygiene, and she needed help doing things around the house.  (*Id.*)  Adams reported having "had a 'very rough week'" and that she rarely left the house.  (*Id.*)  She stated she was not taking care of herself.  (*Id.*)  Adams requested an ADHD evaluation, although she told Story she did not want to take medication if the evaluation was positive.  (*Id.*)  Adams reported a history of sensitivity to medication.  (*Id.*)  On examination, Story found Adams downcast, calm, wary, attentive, tense, and communicative, with normal speech, sad demeanor, underlying depressed mood, intact associations, and fair insight and judgment.  (*Id.* at 1661.)  Story noted signs of anxiety and moderate depression.  (*Id.*)  Story again found Adams "cooperative and attentive with no gross behavioral abnormalities."  (*Id.*)

On May 15, 2023, Adams saw Story for counseling and reported continued anxiety, panic attacks, and depression.  (*Id.* at 1657.)  Adams told Story she had experienced a panic attack on Mother's Day while at church with her family.  (*Id.*)  Adams explained that the noise and the closeness of the people were too much, and she had to go to her car.  (*Id.*)  Adams reported she wanted to see her son graduate from eighth

4

grade, but she did not think she could do it.  (*Id.*)  Adams stated she could shop at a small grocery store near her house with her ex-husband, but that she could not shop at a regular grocery store.  (*Id.*)  She could go to a park with a lot of open space, but she could not walk in her development.  (*Id.*)  Adams reported she had not been able to go out with her friends for the past few years.  (*Id.*)  Story noted Adams showed "an inadequate treatment response as of today."  (*Id.*)  On examination, Story found Adams glum, attentive, communicative, and tense, with a glum demeanor, depressed mood, normal speech, appropriate and full range of affect, intact associations, and fair insight and judgment.  (*Id.* at 1658.)  Story noted signs of anxiety and moderate depression.  (*Id.*)  Story again found Adams "cooperative and attentive with no gross behavioral abnormalities."  (*Id.*)

On November 6, 2023, Adams saw Story for counseling and reported worsening anxiety and depression.  (*Id.* at 1736.)  Adams also endorsed continuing agoraphobia, stating that she feared leaving her home, as well as crowds, lines, and public transportation.  (*Id.*)  That day, Adams told Story her anxiety was "very bad" that day, and she was "very depressed."  (*Id.*)  Adams reported being overwhelmed by all the things she needed to do, which triggered her anxiety, and she procrastinated and took two naps a day.  (*Id.*)  On examination, Story found Adams irritable, glum, wary, attentive, communicative, tense, and unhappy, with normal speech, glum demeanor, downcast appearance, depressed thought content, depressed mood, appropriate affect, intact associations, and fair insight and judgment.  (*Id.* at 1737.)  Story noted signs of anxiety and moderate depression.  (*Id.*)  Story again found Adams "cooperative and attentive with no gross behavioral abnormalities."  (*Id.*)  Adams' diagnoses consisted of major depressive disorder, recurrent, moderate, agoraphobia with panic disorder, generalized anxiety disorder, and alcohol use, unspecified with unspecified alcohol-induced disorder (full remission).  (*Id.*)

On January 31, 2024, Story wrote a letter to Adams' counsel setting forth Adams' physical and mental diagnoses and explaining that Adams had "a very difficult time leaving her home," as well as grocery

shopping, and she often had someone shop for her.  (*Id.* at 1743.)  Adams attended counseling and psychiatry appointments virtually.  (*Id.*)  She experienced panic attacks in crowded places.  (*Id.*)  Story stated that Adams had "very low energy for daily tasks" and opined that Adams "would not be able to attend work for an 8 hour day."  (*Id.*)  Story further opined Adams "would need to take breaks and it is unclear as to whether she would be able to get to work, due to panic attacks and anxiety."  (*Id.*)  Story further opined that even if Adams obtained a remote job, she "would not be able to focus on her work for an 8 hour day" because of her low energy level.  (*Id.*)

That same day, Story completed a Medical Source Statement as to Ability to Perform Work Related Activities (Mental).  (*Id.* at 1744-46.)  Story opined Adams had extreme limitations in the following abilities: perform and complete work tasks in a normal work day or work week at a consistent pace; perform at production levels expected by most employers; and tolerate customary work pressures.  (*Id.* at 1745-46.)  Story further opined Adams had marked limitations in the following abilities: respond appropriately to coworkers or peers; relate to the general public and maintain socially appropriate behavior; work in cooperation with or in proximity to others without being distracted by them; maintain attention and concentration for more than brief periods of time; and behave predictably, reliably, and in an emotionally stable manner.  (*Id.* at 1744-45.)  Story further opined Adams had moderate limitations in the following abilities: work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes; carry through instructions and complete tasks independently; and respond appropriately to changes in the work setting.  (*Id.*)  Story further opined Adams would miss two or more partial or full days of work a month, and Adams' condition was likely to deteriorate if Adams was placed under stress, especially the stress of full-time work.  (*Id.* at 1746.)  Story explained that Adams' "anxiety would increase + and she would be more likely to have panic attacks."  (*Id.*)

6

Case: 1:25-cv-00790-BMB  Doc #: 9  Filed: 11/18/25  7 of 22.  PageID #: 1805


**C.     State Agency Reports**

On March 2, 2023, Audrey Todd, Ph.D., reviewed the file and opined that Adams had no limitation in her ability to understand, remember, or apply information. (*Id.* at 194-95.) Dr. Todd further opined Adams had mild limitations in her ability to interact with others and concentrate, persist, or maintain pace, and she had a moderate limitation in her ability to adapt or manage herself. (*Id.* at 194.) Dr. Todd determined that Adams required a work environment with infrequent changes that can be explained in advance. (*Id.* at 198.)

On June 26, 2023, on reconsideration, Courtney Zeune, Psy.D., reviewed the file and agreed that Adams had no limitation in her ability to understand, remember, or apply information. (*Id.* at 204-05.) Dr. Zeune opined that Adams had moderate limitations in her ability to interact with others and adapt or manage herself, and a mild limitation in her ability to concentrate, persist, and maintain pace. (*Id.* at 204.) Dr. Zeune further opined Adams could have no more than superficial contact with others in a workplace setting. (*Id.* at 208.) Dr. Zeune agreed that Adams required a work environment with infrequent changes that can be explained in advance. (*Id.*)

**D.     Hearing Testimony**

During the January 18, 2024 hearing, Adams testified to the following:

- She lives with her ex-husband and 14-year-old son. (*Id.* at 168, 176.) She had been living on her own until February 2023 when she had to move back in with her ex-husband for financial reasons since she could not work. (*Id.* at 168.) Her son tries to help her. (*Id.* at 176.)

- She takes Zoloft, but she is experiencing side effects, so her doctor needs to adjust her dosage. (*Id.* at 171.) The side effects include restless heart, low blood pressure, gastroenterological issues, sweating, and insomnia. (*Id.* at 172.) She also takes Valium for her PTSD, agoraphobia, anxiety, and depression. (*Id.* at 171.) She has POTS and a sensitivity to medication. (*Id.* at 172.) There is a lot of trial and error with medication, so her doctors are slowly working on antidepressants. (*Id.*) She has tried "just about all" antidepressants in the past and they have not worked. (*Id.*) She uses natural remedies in addition to Zoloft and Valium. (*Id.* at 172-73.)

- Her mental impairments cause concentration issues.  (*Id.* at 175.)  She freezes and cannot find the right words.  (*Id.*)  Her anxiety is very high.  (*Id.*)  She struggles to get along with others on a job because she shuts down and she does not talk much because she's afraid of saying or doing the wrong thing. (*Id.*)  She has agoraphobia and struggles to be around people.  (*Id.* at 179.)

- She experiences panic attacks three to four times a week.  (*Id.* at 178.)  Anything can trigger her panic attacks; sometimes it's something that she is not able to do, sometimes it's feeling overwhelmed.  (*Id.*)  She also experiences mood swings, along with irritability and severe depression.  (*Id.*)  She cannot complete anything.  (*Id.*)

- She experiences memory problems.  (*Id.* at 179.)  She remembers past events but cannot remember appointments or things that are happening now.  (*Id.*)

The VE testified Adams had past work as a personnel clerk and medical secretary.  (*Id.* at 20, 182.)

The ALJ then posed the following hypothetical question:

> For the first [hypothetical], I'd like you to assume a hypothetical individual with those jobs that you described.  And further assume that this individual is capable of light work.  Or where they can occasionally climb ramps or stairs.  Never climb ladders, ropes or scaffolds.  They can frequently balance.  Occasionally stoop, kneel, crouch or crawl.  They must avoid all exposure to hazards such as unprotected heights, moving machinery and commercial driving.  They can tolerate a routine work setting with few minor changes and can respond appropriately to supervisors, coworkers in work situations if the work does not require more than superficial interaction.  Meaning it does not require any negotiating with instructing, persuading or directing the work of others.  Can this person perform any of Ms. Adams' past work?

(*Id.* at 184-85.)

The VE testified the hypothetical individual would not be able to perform Adams' past work as a personnel clerk or medical secretary.  (*Id.* at 185.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as cleaner/housekeeper, cashier, and merchandise marker.  (*Id.*)

### III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

8

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled. 20 C.F.R. § 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. § 416.920(g).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since November 23, 2022, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: back disorder due to injury; postural orthostatic tachycardia syndrome (POTS); mild osteoarthritis of the knees; depressive disorder; anxiety disorder; posttraumatic stress disorder (PTSD) (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant can occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, crouch, or crawl; must avoid all exposure to hazards such as unprotected heights, moving machinery, and commercial driving; can tolerate a routine work setting with few, minor changes; and can respond appropriately to supervisors, coworkers, and work situations if the work does not require more than superficial interaction, meaning that it does not require negotiating with, instructing, persuading, or directing the work of others.

5.      The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.      The claimant was born on October **, 1974 and was 48 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.      The claimant has at least a high school education (20 CFR 416.964).

8.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since November 23, 2022, the date the application was filed (20 CFR 416.920(g)).

(Tr. 10-22.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance;

it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and

logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

In her sole assignment of error, Adams argues that the ALJ's "cursory rejection" of LPCC Story's treating opinion "was flawed and violated Agency regulations," requiring remand. (Doc. No. 6 at 7.) Adams asserts that the ALJ must consider supportability and consistency "separately[] and then explain how each factor impacted the overall persuasiveness of each medical opinion of record." (*Id.* at 8.) Here, Adams maintains that the "ALJ did little more than conclude that Ms. Story's opinion were not well-supported by Ms. Story's own treatment notes" and that Story "supposedly failed to provide sufficient support" for her opinions. (*Id.* at 9.) Adams accuses the ALJ of attempting "to illustrate a picture where Ms. Story's treatment notes described a normal individual with no more than mild mental health problems," which Adams argues is untrue and inaccurate. (*Id.*) Adams asserts that "[t]he record contained a far greater level of support from Ms. Story then [sic] can be gleaned from the ALJ's decision." (*Id.* at 11.) Adams maintains that because there was no consultative psychological examination in the record, "it was even more critical for the ALJ to properly consider" Story's opinion and provide a "detailed and accurate assessment of the supportability factor." (*Id.* at 12.)

In three sentences at the very end of her brief, Adams argues that the ALJ didn't "really address the consistency factor" outside of finding Story's opinion inconsistent with the record, and the ALJ "failed to

cite anything specific in the record" that was inconsistent with Story's opinion; therefore, the ALJ "similarly failed to evaluate the remaining mandatory factor of consistency." (*Id.*)

The Commissioner responds that the ALJ evaluated Story's opinion in accordance with the regulations, and therefore the ALJ's decision should be affirmed. (Doc. No. 8 at 7.) The Commissioner asserts that Adams' argument that the ALJ must consider the supportability and consistency factors separately should be rejected, as supportability and consistency may overlap. (*Id.* at 9) (citing *Murray v. Comm'r of Soc. Sec.*, No. 5:24CV00639, 2025 WL 2249590, at *10 (N.D. Ohio Aug. 7, 2025)). Reading the ALJ's decision as a whole, as required, the Commissioner argues that the ALJ addressed both the supportability and consistency of Story's opinion. (*Id.* at 9-11.) In addition, the Commissioner maintains that the ALJ "indirectly attacked" Story's opinion by finding the opinion of state agency reviewer Dr. Zeune "the most persuasive in the record," and Adams fails to challenge the ALJ's "evaluation (or adoption) of" Dr. Zeune's findings on judicial review. (*Id.* at 12.) The Commissioner argues that even if a preponderance of the evidence supported a finding that Story's opinion was persuasive, the Court must affirm the decision as substantial evidence also supports the ALJ's opposite conclusion. (*Id.* at 13) (citing *Bauer v. Comm'r of Soc. Sec.*, No. 1:22-CV-01979, 2023 WL 7927978, at *12 (N.D. Ohio Oct. 31, 2023), *report and recommendation adopted by* 2023 WL 7924813 (N.D. Ohio Nov. 16, 2023)). The Commissioner asserts that Adams cannot accuse the ALJ of cherry-picking the record, as the ALJ discussed both normal and abnormal findings in Story's treatment records. (Doc. No. 8 at 13.)

Finally, the Commissioner maintains that even assuming, *arguendo*, the ALJ failed to properly evaluate Story's opinion, substantial evidence still supports the ALJ's decision as Story's opinion "consisted of a checkbox form" with "cursory statements—in the form of symptoms and diagnoses—for her findings," which the Sixth Circuit has found "'patently deficient.'" (*Id.* at 15) (citations and further internal quotation marks omitted). In a footnote, the Commissioner notes that while Story wrote a one-page letter to

accompany her checkbox opinion, the letter "essentially cited diagnoses, symptoms, and subjective reports," which the Commissioner maintains "does not provide sufficient support for the findings assessed in the Medical Source Statement."  (*Id.* at n.10) (citing *Dornan v. Comm'r of Soc. Sec.*, No. 1:22-CV-02244, 2023 WL 8789168, at *10 (N.D. Ohio Dec. 4, 2023), *report and recommendation adopted by* 2023 WL 8780713 (N.D. Ohio Dec. 19, 2023)).

Since Adams' claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 416.920c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources."  20 C.F.R. § 416.920c(a).  Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[4] (2) consistency;[5] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary

---

[4] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1).

[5] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2).

requirements. 20 C.F.R. § 416.920c(a), (c)(1)-(5). However, supportability and consistency are the most

important factors. 20 C.F.R. § 416.920c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of

medical opinions. The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

> (3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical

opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered

15

the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. § 416.920c(a), (b)(1)).  A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

At Step Two, the ALJ found as follows regarding Adams' mental impairments:

> The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, and 12.15. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.
>
> In understanding, remembering or applying information, the claimant has no limitation. The claimant alleged that she has difficulty remembering generally, and understanding what is said to her. However, the claimant also stated that she could prepare meals, pay bills, count change, manage funds, drive, care for her teenage son and pets at home, take medications without reminders, follow instructions satisfactorily, attend to her own personal care needs without reminders, shop, do laundry, and read (3E). In addition, the record shows that the claimant was able to provide information about her health, describe her prior work history, follow instructions from healthcare providers, comply with treatment outside of a doctor's office or hospital, and there is any mention of any issues with the claimant's short- or long-term memory.
>
> In interacting with others, the claimant has a moderate limitation. At the hearing, the claimant alleged that she has difficulty associating with others. However, in her function report, she reported no difficulty getting along with others. Further, according to her statements, the claimant is also able to shop, spend time with friends and family, attend church, deal appropriately with authority, and live with others, and she has never been fired or laid off from a job due to problems getting along with others (3E). Finally, the medical evidence shows that the claimant was described as friendly and cooperative (8F, 15F). Although the claimant prefers not to be around others, her ability to deal with others at home, while performing activities of daily living, and in other scenarios indicates that her difficulties are neither marked nor extreme.
>
> With regard to concentrating, persisting or maintaining pace, the claimant has a mild limitation. The claimant contended that she has limitations in concentrating generally and completing tasks. On the other hand, the claimant

16

said that she is also able to prepare meals, pay bills, count change, manage funds, drive, care for her teenage son and pets at home, take medications without reminders, follow instructions satisfactorily, attend to her own personal care needs without reminders, shop, do laundry, and read (3E). Additionally, the record fails to show any mention of distractibility (8F, 15F).

As for adapting or managing oneself, the claimant has experienced a moderate limitation. The claimant asserted that she has difficulties managing her mood and handling stress. She is able to handle change, attend to her own personal care needs, care for her teenage son and pets at home, and perform most activities of daily living (3E; Hearing Testimony). Meanwhile, the objective evidence in the record showed the claimant to have fair insight and judgment and no problems with temper control (Exhibits 4F, 5F, 14F).

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. To fulfill the "paragraph C" criteria, an individual must demonstrate a medically documented history of a mental disorder that has lasted for at least two years. She must further show that she relies on medical treatment, mental health therapy, psychosocial support, or a highly structured setting to diminish the symptoms of that mental impairment, and that despite these diminished symptoms and signs, she has achieved only marginal adjustment. First, it is clear in this case that the claimant's mental impairments have persisted for more than two years. Further, the claimant was receiving treatment in the form of outpatient therapy and outpatient medical management. However, the evidence fails to show that the claimant has achieved only marginal adjustment (i.e. she has only a minimal ability to adapt to changes in her environment and daily life). In view of the above, the undersigned finds that the "paragraph C criteria are not met in this case.

(Tr. 13-14.)

In the RFC analysis, the ALJ found as follows:

Claimant saw Carol Story, LPCC, with Benhaven Counseling for three sessions from April 2023 to May 2023. Diagnoses indicated as generalized anxiety disorder, major depressive disorder, panic disorder without agoraphobia, and posttraumatic stress disorder. Claimant reported excessive fatigue, decreased sociability, excessive worrying, and difficulty focusing (8F). On May 24, 2023, claimant appeared friendly, wary, attentive, communicative, casually groomed, and tense. Her speech was normal. She had signs of moderate depression but no suicidal ideation and no signs of psychotic symptoms. She had fair insight and judgment, and she was cooperative and attentive with no gross behavioral abnormalities (8F/3, 4).

In November 2023, claimant reported worsening anxiety and depression to Ms. Story. On exam, claimant appeared irritable glum, wary, attentive, communicative, casually groomed, normal weight, tense and unhappy. She presented with signs of moderate depression and anxiety. She had no suicidal ideation or signs of psychotic symptoms. Insight and judgement were fair. There were no signs of hyperactive or attentional difficulties. She was cooperative and attentive with no gross behavioral abnormalities (15F/2, 3). Three weeks later, the claimant reported setting up 5 Christmas trees in her house, exercising more frequently, and shopping at a nearby grocery store (15F/5).

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

Inconsistencies between the claimant's statements and the rest of the medical evidence cause the undersigned to determine that the individual's alleged symptoms are less likely to reduce the claimant's capacity to perform work-related activities. The undersigned has also considered the consistency of the claimant's testimony concerning symptoms with statements in the record made prior to the hearing. Evaluation of the claimant's symptoms in comparison to the claimant's prior statements and the medical records as a whole is described below with specific examples supporting the undersigned's decision that the claimant's symptoms are less likely to reduce the claimant's capacity to perform work-related activities (See SSR 16-3p).

First, the objective evidence of record is inconsistent with the claimant's allegations in this case, as set forth above. The record does not demonstrate the significantly limited range of motion, motor weakness, neurological deficits, or sensation loss that are associated with intense and disabling pain (1F, 3F, 5F, 11F). Diagnostic imaging has demonstrated no more than mild findings (1F, 5F). Moreover, in March 2023, she reported some improvement in symptoms (5F/11-16). The record also does not contain the level of abnormal psychiatric signs of behavior, affect, thought, memory, orientation, and contact with reality that are normally associated with intense and disabling psychiatric symptoms (8F, 15F). Further, the record notes no ER visits or inpatient hospitalizations due to mental health symptoms or exacerbations. Moreover, the claimant has reported counseling worked very well for her (6F/11). At her most recent therapy visit, she reported setting up 5 Christmas trees in her house, exercising more frequently, and shopping at a nearby grocery store (15F/5).

The objective evidence indicates the claimant experiences some limitation, but not to such a degree that she is prevented from performing routine work at the light exertional level with limitations that take into account her back and joint

18

pain; symptoms of POTS, including paresthesia, lightheadedness, and instability; and social functioning limitations.

(*Id.* at 17-18.)

Later in the opinion, the ALJ weighed and analyzed LPCC Story's opinion as follows:

Carol Story, LPCC, completed a medical source statement of ability to perform work-related activities (mental) dated January 31, 2024, in which she noted diagnoses as POTS, major depressive disorder, agoraphobia with panic disorder, and generalized anxiety disorder. Ms. Story opined claimant has extreme limitation in her ability to perform and complete work tasks in a normal workday or work week at a consistent pace, to perform at production levels expected by most employers, and to tolerate customary work pressures; marked impairment in her ability to respond appropriately to coworkers, peers and the general public, to work in cooperation with or in proximity to others without being distracted by them, to maintain attention and concentration for more than brief periods of time, to behave predictably, reliably and in an emotionally stable manner; and moderate impairment in her ability to carry through instructions and complete tasks independently and to respond appropriately to changes in work setting. Ms. Story concluded claimant would likely have unscheduled absences from work occurring 2 or more partial or whole days per month, and her condition would likely deteriorate if she were placed under the stress of an 8 hour per day, 5 day per week (16F). The undersigned finds this opinion is unpersuasive, as the assessment overstates the severity of her limitations in comparison to the medical evidence of record, and it lacks adequate support and detail. Further, there is nothing in Ms. Story's own mental health notes that would support such limitations. Specifically, claimant consistently noted as cooperative and attentive with no suicidal ideation or gross behavioral abnormalities (8F, 15F).

(*Id.* at 19.)

In contrast, the ALJ found the opinion of state agency reviewing psychological consultant Dr. Zeune persuasive for the following reasons, a finding Adams does not challenge on judicial review:

A State agency consultant performed a psychiatric review of the claimant dated March 2, 2023. The consultant wrote that the claimant's 12.04 depressive, bipolar and related disorders, and 12.06 anxiety and obsessive compulsive disorders cause the following degree of limitation in the broad areas of functioning set out in the disability regulations for evaluating mental disorders and in the mental disorders listings in 20 CFR, Part 404, Subpart P, Appendix 1: no difficulties in understanding, remembering or applying information; mild difficulties in interacting with others; mild difficulties in concentrating, persisting or maintaining pace; and moderate difficulties in adapting or managing oneself. The consultant concluded claimant was limited to work

> involving infrequent changes that can be explained in advance (2A). Upon reconsideration, a State agency consultant changed interacting with others to moderate and limited claimant to no more than superficial contact with others in a workplace setting (4A). The undersigned finds the State agency reconsideration determination is more persuasive than the initial determination, though the undersigned used different mental health language to describe claimant's limitations.

(*Id.* at 19-20.)

Reading the opinion as a whole, the ALJ considered the supportability and consistency of LPCC Story's opinions as required by the regulations, discussing evidence that was unsupportive of disability in the process. (*Id.* at 13-20.) The Court rejects any argument that the ALJ cherry-picked the evidence in reviewing Story's opinions; in the paragraphs addressing Story's opinions, as well as the ALJ's decision as a whole, the ALJ discussed the mixed objective evidence contained in the treatment records. (*Id.*) The Court further rejects any argument that the ALJ erred to the extent the ALJ conflated the supportability and consistency factors in the analysis, or to the extent the ALJ's analysis of the supportability and consistency of Story's opinion overlapped. *Murray*, 2025 WL 2249590, at *10.

It is the ALJ's job to weigh the evidence and resolve conflicts, and he did so here. While Adams would weigh the evidence differently, it is not for the Court to do so on appeal.

In addition, as the Commissioner notes, the ALJ was entitled to find Story's medical source statement opinion unpersuasive because it was not accompanied by an explanation of the limitations. The regulations specify that an opinion's persuasive value is based on both the objective evidence and "supporting explanations." *Duke v. Comm'r of Soc. Sec.*, Case No. 21 CV 39, 2022 WL 1075171, at *3 (N.D. Ohio April 11, 2022) (citing 20 C.F.R § 404.1520c). "Courts frequently find that check-box forms, unaccompanied by explanation, are unsupported. *See, e.g.*, *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 630 (6th Cir. 2016) ("The Court has held that an ALJ properly discounted a treating source's questionnaire because the source failed to provide any explanation for his responses) (quotation omitted); *Gallagher v. Berryhill*, 2017 WL 2791106, at *8 (N.D. Ohio June 12, 2017)." *Duke*, 2022 WL 1075171, at *3. *See also*

20

*Rambo v. Comm'r of Soc. Sec.*, No. 1:24-CV-00129, 2024 WL 3813417, at *7 (N.D. Ohio July 9, 2024) (finding opinion in "checkbox format and contain[ing] nothing more than Claimant's diagnoses to support the opined limitations" to be "patently deficient"), *report and recommendation adopted by* 2024 WL 4532777 (N.D. Ohio Oct. 21, 2024); *Kreilach v. Comm'r of Soc. Sec.*, 621 F.Supp.3d 836, 847 (N.D. Ohio Aug. 15, 2022) ("As a general matter, an ALJ may properly give little weight to a medical source's check-box form of functional limitations when it does not cite clinical test results, observations, or other objective findings.") (citing *Ellars v. Commissioner of Soc. Sec.*, 647 F. App'x 563, 567 (6th Cir. 2016)).

Here, Story's medical source statement does not provide any explanation for the opined limitations beyond stating that Adams' anxiety would increase and she would be more likely to have panic attacks as the basis for Story's conclusions regarding absenteeism and that Adams' condition was likely to deteriorate with full-time work.  (Tr. 1744-46.)  The one-page letter Story sent to Adams' counsel along with the medical source statement contains no explanation for the opined limitations beyond Adams' diagnoses, symptoms, subjective reports, and a statement that Adams attends her counseling and psychiatry appointments virtually.  (*Id.* at 1743.)  For this additional reason, the ALJ was entitled to find Story's opinion unpersuasive.  *Duke*, 2022 WL 1075171, at *3; *Rambo*, 2024 WL 3813417, at *7; *Kreilach*, 621 F.Supp.3d at 847.

Again, the findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton*, 246 F.3d at 772-73.

There is no error.

## VII.    CONCLUSION

 For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

21

Date: November 18, 2025                    _s/ Jonathan Greenberg_
                                           Jonathan D. Greenberg
                                           United States Magistrate Judge


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**